Sneed, J.,
delivered the opinion of the court.
The only question presented in this cause is whether Hiram Mills and John Mills, upon the ground of faithlessness or fraud as trustees, are liable to the complainants for the losses shown to have been sustained -by them in the second sale of the real estate of Ambrose Mills, deceased; and upon this question upon- the careful consideration of the record marked by the counsel for both parties, we proceed to state our conclusions without elaboration. We may state at *284 the threshhold that in regard to the question arising under the original bill of William Mountcastle upon the alleged devastavit, we hold these trustees vindicated entirely and completely by the proof in the cause, and their liability to these present complainants must stand or fall upon the case made out under the amended bill. A few facts prominent and uncontroverted in the record must go very far to relieve the case of all difficulty, if indeed they be not decisive of the equities of these parties. It may be laid down as an elementary doctrine of a court' of equity that the mere errors and mistakes of one occupying . the thankless office of a trustee, done or committed upon his best judgment and in good faith with a view to the benefit of his cestui que trust, will always be regarded with leniency and indulgence. “ There is no reason,” as this court has said, “ why he who barely executes a trust should be liable, unless he had a benefit thereby, or did it with a fraudulent view to prejudice others.” McCaleb v. Perry, 5 Hay, 88. On the •other hand, it is equally an elementary doctrine of a court of equity that the good faith of a trustee is his ■only shield, when it is made to appear that under his •administration of the trust, the trust estate has been squandered or diminished, he cannot act for himself, he cannot take a benefit to himself or his friends, he can in nowise take advantage to himself to the disparagement of the interests of the beneficiary, and he will be held to the most exact accountability if a malversation be shown, or even if the suspicion of fraud rests upon his fiducairy action.
*285 The complainants in this cause are Susan Jane Mills and Ellen Jane Mills, the daughters of Ambrose Mills, and the issue of distinct marriages. They are represented in the amended bill by William Mount-castle, the maternal uncle of Susan Jane Mills, and who assumes to be her guardian also, in which right he also sues, and in. whose name as next friend the complainants also sue. Ambrose died intestate in January, 1852, and was the owner, at the time of his. death, of an interest of nine and one-fourth elevenths in a tract of land in Hancock county of two hundred and forty acres, which came to him by inheritance from his father, and by purchase from his coheirs. The other interest of one and three-fourths elevenths of the land belonged to the defendant, Hiram Mills, the brother of the said Ambrose. This tract of land is the subject of 'this litigation. Ambrose Mills lived upon it for several years, and had placed valuable improvements upon it. The said Ambrose Mills left surviving him .three brothers, the said Hiram Mills and John and Perry Mills. Hiram Mills became the administrator of the estate of his brother Ambrose. Perry Mills became the guardian of Susan Jane Mills, and a guardian for Ellen Jane was appointed by the County Court of Bradley county. Perry Mills,- not long after his appointment as guardian, resigned the trust, and thereupon John Mills was appointed by the County Court of Hancock county, in which court the original guardian and the administrator had also been appointed. About the time of the appointment of John Mills as guardian of Susan Jane, *286 iii .the County Court of Hancock, the complainant, Mountcastle, was appointed guardian of the said Susan Jane by the County Court of Hawkins, and an angry contest sprang up between the two as to the guardianship and possession of the ward’s estate, the one guardian being the maternal and the other the paternal uncle of the said Susan Jane Mills. This contest was. initiated by the original bill in this case, with which, however, we have nothing to do. It is charged in the amended bill that these brothers, soon after the death of the said Ambrose, combined together to cheat and defraud the children out of their patrimony — to get possession of the land at an inadequate price; that said administration and guardianship were procured and used to that end; that they did at last succeed, to some extent, in accomplishing their purpose; that a large portion of the estate was lost by an alleged unauthorized sale of the land, fraudulently brought about by the defendants for their own advantage, and for these losses the complainants demand an account and reimbursement. Many other specifications of fraud are charged, all of which are, by the defendants, flatly denied. ■ A vast volume of proof is taken, and much documentary evidence exhibited. We think it is established by the proof that the Mills brothers were anxious to secure the real estate of their deceased brother to one of themselves in the event the sale thereof became necessary in the course of the administration. But considered alone, this fact would signify nothing, as it was neither unnatural nor reprehensible that they should desire to retain the old *287 homestead in the family. It is shown, however, that one of these trustees was heard to say more than onee that he wanted the other to have the land, and at a valuation which is shown to he about half its real value. It is shown also that some of the proprietors of' adjoining lands were anxious to purchase the estate, and that they were both willing and able to pay a round price for it. Under these circumstances a creditor of the estate, when it became apparent that the land must be sold to pay debts, employed counsel to resist in open court the apprehended application of the administrator to make a private sale of the land, and _to secure a public sale in order to secure the highest price. These are prominent facts which meet us at the threshold, and acquire the greater significance as we proceed with the investigation. The first effort made by the administrator to have the land sold was in the Circuit Court of Hancock county, where a decree was actually pronounced; - but it is alleged that the court disallowed the application of the said administrator, Hiram Mills, for. his own appointment as commissioner to effect the sale, and he thereupon dismissed the petition, paid the costs, and obtained a credit for the amount. He next applied by petition to the County Court, where he - had a decree for the sale of .the land, and procured his own appointment as commissioner. The land was sold under this decree, and was bought by John A. Simpson and Rutha Tucker, outbidding the defendant, John Mills. The price brd for the land by Simpson and Tucker was the sum of $4,901, shown to be an adequate *288 price, and, indeed, thought by some to have been more than its value, one of the defendants being heard to say that “ the land sold very high, and that the purchasers would get sick of their bargain.” In the administrator’s petition for a sale, the value of the land is stated at $3,000. He was heard to say repeatedly that the land would not pay the debts of the estate. The debts were nevertheless paid by the sale, the estate wound up and the sum of $3,007.24 of surplus paid into the hands of the guardian. In the meantime an enmity and a fued existed between Hiram Mills and John A. Simpson, the purchaser. In their negotiations for a partition, it is said that the said Hiram Mills, as tenant in common, asserted a right of participation in the valuable improvement put upon the estate by his brother Ambrose, and that Simpson resisted this demand, claiming to be subrogated to all the equities of Ambrose in his life-time, and that on a partition merely, that the said Ambrose would have been allowed the benefits of his improvements. It is stated that the purchasers, Simpson and Tucker, filed their bill to have their equities adjusted, and for a partition; that the bill was answered, much proof taken, and an angry .litigation ensued; that the cause was ready to be heard, when the controversy was abruptly terminated by an injunction obtained upon the intervention of John Mills upon his cross bill as next friend to the children of Ambrose, filed by leave, to set aside the sale under the decree of the County Court to Simpson and Tucker, and to have the land partitioned between the complainants and the said Hi *289 ram, upon the alleged ground that the original sale was null and void for the reason that the process was not served upon the children, that no debts were shown in the petition, that no account was ordered to ascertain them, and that no guardian ad litem, was appointed. Upon the hearing of the cause upon the cross bill answers and proofs, the Chancellor declared the sale to Simpson and Tucker to be null and void, and directed a partition as prayed for. The Chancellor decreed also that the large payment of the purchase money made by Simpson and Tucker should be refunded to them. It seems to have been apparent, and well understood, that this indebtedness could not be paid except by a resale of the land. The partition was had, - however, and it is charged in the bill that the said Hiram so controlled the said partition as to get the benefit of the improvements referred to, and to have his own interest laid off so as to lie between Simpson’s contiguous tract and the main body of the land in question, and thus get rid of Simpson as a rival bidder at the next sale. Under the decree of the Chancellor, Simpson and Tucker were required to account for the rents while they had possession, and upon the account taken the interest on their purchase money was found to exceed the rents, and some $957 lost to the complainants by the transaction. The land was resold, and there were only two bidders, Hiram and Perry Mills, to the latter of whom the land was bid off at $4,550, it being less by $351 than the amount for which the land had originally sold. It should be stated that the cross *290 bill, the filing of which is charged to have been instigated by Hiram Mills, does not aver that the land had been sold for an inadequate price, or that it can be sold for a better price, or that it will in any manner be to the advantage of the children to resell the same. It merely demands the sale upon the technical grounds stated. In consequence' of these proceedings the complainants not only lost the sums already stated, but they were taxed with part of the costs and with counsel fees amounting to the sum of $278.73. Their little estate was also charged with the sum of $245, paid to the defendant, Hiram Mills, as commissions for selling the land under this decree of the County Court, the very decree which he is shown to have obtained, and afterward to have been so active in causing to be annulled. It is not necessary to characterize the motives of these defendants. We see in this record some evidences of good faith in the long and chequered history of these transactions. It would not be just to impute to them a disposition to cheat and swindle the children of their deceased brother. We think it is clear that, instead of the unnatural purpose of defrauding their brother’s children, they were actuated by the design, in all they have done in this last transaction, to foil and circumvent their enemy in getting possession of the land. A court of equity will demand to know this motion, and whether their eonduct be referred to a deliberate purpose of fraud, or to a mere stratagem to defeat the purchase of Simpson and Tucker, or to any other conceivable motive than the best interest of their oestuis *291 que trust, and an honest purpose to benefit them, a •court of equity will compel them to expiate this great wrong. They insist in their defense that the bona Jides of their transactions have been passed upon by the Chancellor, and that in the decree setting aside ■the first sale the Chancellor pronounced in favor of their good faith, and that the same is now res judi-cata. To this it must be replied that the same Chancellor, when all these facts were brought before him, held that “John Mills and Hiram Mills improperly procured the resale of the land in the pleadings mentioned whereby great loss was sustained by the complainants,” and an account of said losses was accordingly ordered.
We are ■ asked to reverse this decree upon the ground that the proceedings of the- County Court under which the original sale was had were so irregular as to render the sale under them null and void. In looking to those proceedings we find that Perry Mills, the brother of the petitioner, was made defendant to the petition as guardian of both of the minor heirs of Ambrose Mills, and that he came into court and waived the issuance of process for his wards, and answered the petition in which, according to the decree, “all the allegations in said petition are admitted to be true, and agrees, as guardian as aforesaid for and on behalf of said minor children, that as it will be greatly to the interest of said wairds, the administrator may sell the land as the court may direct.” But it seems from said decree that the slaves were directed to be sold to pay the debts, and the land to be sold be *292 cause it was to the manifest interest of the minors, that the same be sold. This feature of the case is remarkable, and tends to throw around their transactions another great cloud of suspicion. We are not prepared to say, under the rulings of this court in. the construction of our statutes, that these proceedings, of the County Court were regular and valid. It is-not essential that the question whether the said sale be valid, void or voidable, should be now determined. The equities of these parties do not turn upon that question. Whether that sale be void or valid, it was, beyond all controversy, a most advantageous sale to these complainants, and it was one which these defendants were bound to uphold and not destroy. If it was a void sale, then the purchasers might have complained; but as they did not, and as it is shown that the sale was more advantageous than any sale of that land could ever be again, then it was the manifest duty of these defendants to let it stand, and to abide the majority of the children who might affirm or disaffirm it. This court has said that “as between the purchaser and the infants, when we can see that the sale was advantageous 'to the latter, and that a loss would result from setting it aside, we would not do so for irregularities or defects which can be cured by decreeing the title to the purchaser. The court will afford to the infants the proper protection by securing to them an advantageous sale.” Swan v. Newman, 3 Head, 390, 391. In that case the bill was filed by the purchaser to have the sale set aside for supposed irregularities. And even conceding the origi *293 nal sale to be absolutely void in this case, bow would a Court of Chancery respond to an application by the administrator himself under the facts of this case ? •For though John Mills, the guardian, put himself forward in this case as the champion of the complainants, yet we cannot doubt under the proof that Hiram Mills was the prime mover and instigator of this proceeding. His very answer to the cross bill betrays him, and shows not only a ready accord with the purposes of the bill, but a connivance at the institution of that part of this most remarkable litigation. A court of equity will scrutinize the motives of men, and especially those who occupy a relation of trust to infants and others under disability. It is apparent in this case- that the defendants' were actuated by no motive to advance the interests or increase the fortunes of their complainants in their superserviceable and unnecessary interference with this sale. Whether regular or irregular, void or valid, it was not their province, above all men; to attack it. They have brought, by their conduct, a great loss upon these complainants, and whether their motives be founded in malice or fraud, there is such an absence of that character of fiduciary good faith which. a court of equity demands, that' they must be held to answer for it.-
Affirm the decree and remand the cause.